# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SUPERIOR OFFSHORE | § | CASE NO. 08-32590-H2-11 |
| INTERNATIONAL, INC., | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

**FIRST AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125
IN SUPPORT OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF
LIQUIDATION SUBMITTED BY SUPERIOR OFFSHORE INTERNATIONAL, INC.
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AS MODIFIED**

**THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS AND INTEREST HOLDERS OF THE DEBTOR ENTITLED TO VOTE ON THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION SUBMITTED BY SUPERIOR OFFSHORE INTERNATIONAL, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE CONCERNING THE PLAN. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE DISCLOSURE STATEMENT WITH CARE AND IN ITS ENTIRETY.**

**ON JANUARY 9, 2009, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE. SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN HEREIN DESCRIBED IS BEING SOUGHT FROM CREDITORS AND INTEREST HOLDERS WHOSE CLAIMS AGAINST, AND INTERESTS IN THE DEBTOR ARE IMPAIRED UNDER THE PLAN. <u>CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN</u> AND TO RETURN THE COMPLETED BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT IN THE ACCOMPANYING ENVELOPE ADDRESSED TO PORTER & HEDGES, L.L.P., ATTENTION: DAVID R. JONES, 1000 MAIN STREET, 36TH FLOOR, HOUSTON, TEXAS 77002, NOT LATER THAN 12:00 NOON ON JANUARY 26, 2009.**

| | |
|---|---|
| **Porter & Hedges, L.L.P.** | **Liskow & Lewis** |
| David R. Jones | Michael D. Rubenstein |
| Joshua W. Wolfshohl | John G. Almy |
| 1000 Main Street, 36th Floor | 1001 Fannin, Suite 1800 |
| Houston, Texas 77002 | Houston, Texas 77002 |
| (713) 226-6000 | (713) 652-2900 |
| (713) 228-1331 (facsimile) | (713) 651-2908 (facsimile) |
| **Counsel for Superior Offshore International, Inc.** | **Counsel for the Official Committee of Unsecured Creditors** |

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 INTRODUCTION** ......................................................................................................1
    1.1    GENERAL INFORMATION CONCERNING DISCLOSURE STATEMENT AND PLAN. .......................1
    1.2    DISCLAIMERS. .................................................................................................................1
    1.3    ANSWERS TO COMMONLY ASKED QUESTIONS. ...............................................................3

**ARTICLE 2 OVERVIEW OF PLAN** ............................................................................................5

**ARTICLE 3 THE DEBTOR** ..........................................................................................................6
    3.1    THE DEBTOR'S BUSINESS AND CAPITAL STRUCTURE. .....................................................6
    3.2    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE. .................................................12

**ARTICLE 4 CLASSIFICATION OF CLAIMS** .........................................................................15
    4.1    CLAIMS AGAINST THE DEBTOR. ...................................................................................15

**ARTICLE 5 IMPAIRMENT OF CLAIMS AND RESOLUTION OF CLAIM CONTROVERSIES** ...............15
    5.1    IMPAIRED CLASSES. ......................................................................................................15
    5.2    UNIMPAIRED CLASSES. .................................................................................................16
    5.3    CONTROVERSY CONCERNING CLASSIFICATION, IMPAIRMENT OR VOTING RIGHTS. ......16

**ARTICLE 6 TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS** .....................16
    6.1    TREATMENT OF ALLOWED IMPAIRED CLAIMS. .............................................................16
    6.2    TREATMENT OF ALLOWED UNIMPAIRED CLAIMS. .........................................................18
    6.3    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ..............................18

**ARTICLE 7 MEANS OF IMPLEMENTATION** .......................................................................19
    7.1    VESTING OF PROPERTY OF THE ESTATE IN THE LIQUIDATING DEBTOR. .........................19
    7.2    CONTINUATION OF OPERATIONS. ..................................................................................19
    7.3    GENERAL POWERS OF THE LIQUIDATING DEBTOR .......................................................19
    7.4    LIMITATIONS ON THE POWERS OF THE LIQUIDATING DEBTOR. ......................................21
    7.5    THE COMMITTEES. .......................................................................................................21
    7.6    THE POST-CONFIRMATION COMMITTEE. .......................................................................22
    7.7    RESIGNATION/REMOVAL OF THE PLAN AGENT. .............................................................22
    7.8    APPOINTMENT OF SUCCESSOR PLAN AGENT. .................................................................23
    7.9    RIGHTS AND DUTIES OF POST-CONFIRMATION COMMITTEE. ..........................................23
    7.10  ADDITIONAL RIGHTS AND DUTIES OF THE POST-CONFIRMATION EQUITY SUBCOMMITTEE. .....................23
    7.11  COMPENSATION PROCEDURES. ......................................................................................23

**ARTICLE 8 CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED CLAIMS/INTERESTS AND PROCEDURES FOR ASSERTING CLAIMS** ................................24
    8.1    OBJECTION PROCESS. ...................................................................................................24
    8.2    FILING OF CLAIMS AND CAUSES OF ACTION. ...............................................................24
    8.3    DISPUTED CLAIMS RESERVE. .......................................................................................25
    8.4    DISTRIBUTIONS TO HOLDERS OF DISPUTED CLAIMS AND DISPUTED INTERESTS. ............25
    8.5    DISALLOWANCE OF LATE FILED PROOFS OF CLAIM. .....................................................25
    8.6    PROVISIONS GOVERNING DISTRIBUTIONS. .....................................................................26

**ARTICLE 9** ...................................................................................................................................27
    9.1    LEGALLY BINDING EFFECT. ..........................................................................................27
    9.2    LIMITED DISCHARGE OF DEBTOR AND INJUNCTION. ......................................................27
    9.3    LIMITED PROTECTION OF CERTAIN PARTIES IN INTEREST. ............................................27
    9.4    INDEMNIFICATION. .......................................................................................................28
    9.5    CONTINUATION OF ANTI-DISCRIMINATION PROVISIONS OF THE BANKRUPTCY CODE. ............28

9.6      PRESERVATION OF CLAIMS AND RIGHTS. ......................................................................................29

**ARTICLE 10   CONFIRMATION OF THE PLAN** .................................................................................**30**

10.1      CONFIRMATION HEARING. ....................................................................................................30
10.2      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. ..............................................30
10.3      CRAMDOWN. ........................................................................................................................32
10.4      CONDITIONS PRECEDENT TO EFFECTIVE DATE. ....................................................................34
10.5      ANNULMENT OF PLAN IF CONDITIONS NOT WAIVED OR SATISFIED. ......................................34
10.6      RETENTION OF JURISDICTION BY BANKRUPTCY COURT. ........................................................34

**ARTICLE 11   MISCELLANEOUS PROVISIONS** ..................................................................................**34**

11.1      COMPLIANCE WITH LAW. ....................................................................................................34
11.2      AMENDMENTS TO THE PLAN. ...............................................................................................35
11.3      TIMING OF DISTRIBUTIONS. .................................................................................................35
11.4      OTHER CONSIDERATIONS. ....................................................................................................35
11.5      FEASIBILITY OF THE PLAN. ..................................................................................................35
11.6      CONTINUATION OF THE CASE. ..............................................................................................36
11.7      ALTERNATIVE PLANS OF REORGANIZATION. .........................................................................36
11.8      LIQUIDATION UNDER CHAPTER 7. ........................................................................................36
11.9      RISK FACTORS. ...................................................................................................................36
11.10     TAXATION ..........................................................................................................................37

**ARTICLE 12   CAUSES OF ACTION** ...................................................................................................**40**

12.1      PREFERENCES. ....................................................................................................................40
12.2      FRAUDULENT TRANSFERS. ...................................................................................................40

**ARTICLE 13   VOTING PROCEDURES AND REQUIREMENTS** ........................................................**40**

13.1      BALLOTS AND VOTING DEADLINE. .......................................................................................40
13.2      CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE. .....................................................41
13.3      VOTING PROCEDURES. .........................................................................................................41
13.4      VOTE REQUIRED FOR CLASS ACCEPTANCE. ..........................................................................42
13.5      CRAMDOWN AND WITHDRAWAL OF THE PLAN. .....................................................................42

# ARTICLE 1
## INTRODUCTION

**1.1    General Information Concerning Disclosure Statement and Plan.**

Superior Offshore International, Inc. (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") submit this Disclosure Statement, as may be amended from time to time, under § 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to all of the Debtor's known Creditors and Interest Holders. The purpose of this Disclosure Statement is to provide adequate information to enable Creditors and Interest Holders who are entitled to vote on the First Amended Joint Chapter 11 Plan of Liquidation Submitted by Superior Offshore International, Inc. and the Official Committee of Unsecured Creditors (the "Plan") to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan. A copy of the Plan is included with this Disclosure Statement. Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to them in the Plan or in the Bankruptcy Code and Bankruptcy Rules. All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtor and the Committee have proposed the Plan consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is to liquidate and administer the estate's assets and to provide the maximum recovery to each Class of Claims and Equity Interests based upon the amounts realized from the liquidation. The Debtor and the Committee believe that the Plan provides for the maximum recovery available for all Classes of Claims and Equity Interests.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Equity Interests under the Plan. It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan. Every effort has been made to fully detail the operation of the Plan and to inform Creditors and Interest Holders how various aspects of the Plan affect their respective positions. If any questions arise, the Debtor and the Committee urge you to contact either the Debtor's counsel or the Committee's counsel. These attorneys will attempt to resolve your questions. You are also encouraged to consult with your own counsel. The respective counsel for the Committee and the Debtor are likewise available to answer any questions that your counsel may have regarding the Plan.

**1.2    Disclaimers.**

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND § 1125 OF THE BANKRUPTCY CODE. NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTOR OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT, THE SCHEDULES ATTACHED HERETO AND THE PLAN.**

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE SCHEDULES ATTACHED HERETO, NO REPRESENTATION CONCERNING THE DEBTOR, ITS ASSETS, ITS LIABILITIES, PAST OR FUTURE OPERATIONS, OR CONCERNING THE PLAN IS AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR OR COUNSEL FOR THE COMMITTEE.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION PROVIDED HEREIN WAS OBTAINED FROM A VARIETY OF SOURCES AND IS BELIEVED TO BE RELIABLE.  HOWEVER, THE DEBTOR AND THE COMMITTEE HAVE NOT BEEN ABLE TO INDEPENDENTLY VERIFY EACH AND EVERY STATEMENT CONTAINED HEREIN.  ACCORDINGLY, THE DEBTOR AND THE COMMITTEE CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE DEBTOR'S BUSINESS AFFAIRS ARE COMPLEX AND GAPS EXIST IN THE AVAILABLE DATA.  IT IS POSSIBLE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN COULD HAVE NEGATIVE TAX AND OTHER ECONOMIC CONSEQUENCES.  THE DEBTOR MAKES NO REPRESENTATIONS REGARDING THE TAX IMPLICATIONS OF ANY TRANSACTION CONTEMPLATED UNDER THE PLAN.  IT IS NOT UNCOMMON FOR PARTIES TO RETAIN THEIR OWN TAX ADVISORS TO ANALYZE THE PLAN.  THE DEBTOR AND THE COMMITTEE ENCOURAGE ALL PERSONS THAT MIGHT BE AFFECTED TO SEEK INDEPENDENT ADVICE REGARDING THE TAX EFFECTS OF THE PLAN.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTOR, THE COMMITTEE OR THEIR PROFESSIONALS THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE LIQUIDATION OF THE DEBTOR'S ASSETS OR THAT ALL POTENTIAL ADVERSE EVENTS HAVE BEEN ANTICIPATED.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

### 1.3 Answers to Commonly Asked Questions.

As part of the Debtor's and the Committee's efforts to inform Creditors and Interest Holders regarding the Plan and the Plan confirmation process, the following summary provides answers to questions which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

#### 1.3.1 Who is the Debtor?

The Debtor is Superior Offshore International, Inc., a Delaware corporation. The Debtor was incorporated in April, 2007 in connection with an initial public offering. The Debtor is the successor by merger to Superior Offshore International, L.L.C., a Louisiana limited liability company, originally founded in 1984.

#### 1.3.2 What is a Chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a controlled fashion. The commencement of a chapter 11 case creates an estate containing all the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the Court orders the appointment of a trustee. No trustee has been appointed in this case. The Plan is being jointly proposed by the Debtor and the Committee. Inasmuch as the Debtor's assets are being liquidated, the Debtor and the Committee have agreed to work together and propose a joint plan of liquidation in an effort to minimize the overall administrative costs associated with the bankruptcy case.

#### 1.3.3 If the Plan governs how my Claim or Interest is treated, what is the purpose of this Disclosure Statement?

The Bankruptcy Code requires that in order to solicit votes on a bankruptcy plan, the proponent of the plan must first prepare a disclosure statement that provides sufficient information to allow creditors and other parties to make an informed decision about the plan.

The disclosure statement and plan are distributed to creditors and other parties only after the Bankruptcy Court has approved the disclosure statement and determined that the disclosure statement contains information adequate to allow creditors and interest holders to make an informed judgment about the plan. At that time, creditors and interest holders whose claims and interests are impaired also receive a voting ballot.

### 1.3.4 Has this Disclosure Statement been approved by the Bankruptcy Court?

Yes. On January 9, 2009, the Bankruptcy Court approved this Disclosure Statement as containing adequate information. "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable considering the nature and history of the Debtor and the condition of the Debtor's books and records to enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement does not constitute an endorsement of any of the representations contained in either the Disclosure Statement or the Plan.

### 1.3.5 How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest. Under the Plan, Claims and Interests are classified into a series of Classes. The pertinent articles and sections of the Disclosure Statement and Plan disclose, among other things, the treatment that each class of Claims or Interests will receive if the Plan is confirmed.

### 1.3.6 Why is confirmation of the Plan important?

The Bankruptcy Court's confirmation of the Plan is a condition to the Debtor carrying out the treatment of Creditors and Interest Holders under the Plan. Unless the Plan is confirmed, and any other conditions to confirmation or to the effectiveness of the Plan are satisfied, all parties are legally prohibited from satisfying Claims or Interests as provided in the Plan. Put more simply, confirmation of a plan in chapter 11 is required before the Debtor can begin to pay claims.

### 1.3.7 What is necessary to confirm the Plan?

**Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires, among other things, that at least one class of impaired Claims or Interests vote to accept the Plan. Acceptance by a class of claims means that at least two-thirds in the total dollar amount and more than one-half in number of the allowed Claims or Interests actually voting in the class vote in favor of the Plan. Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims.** Besides acceptance of the plan by each class of impaired creditors or interests, a bankruptcy court also must find that a plan meets a number of statutory tests before it may confirm the plan. These requirements and statutory tests generally are designed to protect the

interests of holders of impaired claims or interests who do not vote to accept a plan but who will nonetheless be bound by a plan's provisions if a bankruptcy court confirms a plan. If one or more classes vote to reject a plan, a plan proponent may still request that the bankruptcy court confirm a plan under § 1129(b) of the Bankruptcy Code. To confirm a plan not accepted by all classes, the plan proponent must demonstrate that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan. This method of confirming a plan is commonly called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

### 1.3.8 Is there a Committee in this case?

Yes. The Office of the United States Trustee has appointed two official committees in this case. The Official Committee of Unsecured Creditors represents the interests of unsecured creditors in the case and is a proponent of the Plan. There is also an Official Committee of Equity Security Holders which represents the interests of Interest Holders. The Official Committee of Equity Security Holders is not a proponent of but does support the Plan.

### 1.3.9 When is the deadline for returning my ballot?

The Bankruptcy Court has directed that, to be counted for voting purposes, your ballot must be received by the Debtor's counsel by 12:00 noon Houston time, on January 26, 2009.

**IT IS IMPORTANT THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE ON THE PLAN. THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS AND INTEREST HOLDERS. THE DEBTOR AND THE COMMITTEE THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS AND RECOMMENDS THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.**

### ARTICLE 2
### OVERVIEW OF PLAN

An overview of the Plan is set forth below. This overview is qualified in its entirety by reference to the Plan. If the Court confirms the Plan, and in the absence of any applicable stay, and all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

As of the filing of this Disclosure Statement, the Debtor had liquidated substantially all of its tangible assets. The Debtor's primary remaining assets include certain contract rights, claims and causes of action and miscellaneous intangibles. The Debtor is currently holding approximately $84 million in cash. A settlement has been reached between the Debtor and British Petroleum Trinidad and Tobago ("BPTT"). If the settlement is approved by the Bankruptcy Court, the Debtor will receive an additional $11.7 million in cash for distribution.

Under the Plan, the Plan Agent will pay all Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims in cash and in full on the later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such date as the Plan Agent and the holder of the Claim agree. On the Initial Distribution Date, the Plan Agent will make a distribution to Allowed General Unsecured Claims based on Available Cash. Additional distributions will be made as assets are liquidated and cash is available up to the amount of the Allowed General Unsecured Claims. If sufficient funds exist, holders of Allowed General Unsecured Claims will also receive interest. If sufficient funds exist thereafter, distributions will be made to Allowed Subordinated Claims, Allowed Subordinated Securities Claims, and Equity Interests as set forth in the Plan.

On the Effective Date of the Plan, the Debtor will continue to exist as a corporate entity with limited authority to (i) take such actions necessary to bring its business operations to an orderly conclusion; (ii) file claim objections; (iii) make distributions and take such other action as provided for under the Plan; and (iv) prosecute causes of action owned by the Debtor's estate, including all claims and causes of action arising under the Bankruptcy Code. Once these tasks are completed, the Debtor will be dissolved.

## ARTICLE 3
## THE DEBTOR

**3.1    The Debtor's Business and Capital Structure.**

### 3.1.1    The Debtor's Pre-petition Business

The Debtor is a Delaware Corporation formed in April 2007 as part of an initial public offering and merger of the Debtor's predecessor, Superior Offshore International, L.L.C., a Louisiana limited liability company originally founded in 1984. The Debtor is the 100% owner of Superior Offshore Holdings, Ltd. f/k/a Superior Subsea Holdings, Ltd., which, in turn, owns 100% of (i) Superior Offshore Personnel Services, Ltd. (Caymans) f/k/a Superior Subsea Personnel Services, Ltd., (ii) Superior Offshore Contractors, Ltd. (Caymans) f/k/a Superior Subsea Contractors, Ltd., and (iii) Superior Offshore (Barbados) SRL (collectively, the "Debtor Subsidiaries"). None of the Debtor Subsidiaries have any ongoing operations nor have they filed bankruptcy.

Prior to the Petition Date, the Debtor and its subsidiaries provided subsea construction and commercial diving services to the crude oil and natural gas exploration and production industry. The Debtor operated internationally and on the outer continental shelf of the Gulf of Mexico. The Debtor's subsea construction services included installation, upgrading and decommissioning of pipelines and production infrastructure, and its commercial diving services included recurring inspection, maintenance and repair services and support services for subsea construction operations. The Debtor also operated a fabrication business that supported its subsea construction and commercial diving operations.

During late 2007 and early 2008, the Debtor attempted to reduce operating costs through a number of measures including staff reductions. On April 22, 2008, the Debtor had approximately 250 employees. Shortly before filing for chapter 11 on April 24, 2008, the Debtor

engaged H. Malcolm Lovett, Jr. as its chief restructuring officer to advise the Debtor regarding its options. Mr. Lovett was also appointed to the board of directors. In connection with the bankruptcy filing, the Debtor reduced its workforce to approximately 38 key employees. As these employees completed certain indentified tasks, further reductions occurred. As of the date of this Disclosure Statement, there are 4 full-time employees in addition to Mr. Lovett. The sole remaining board member is Mr. Lovett.

### 3.1.2 The Debtor's Capital Structure

On the Petition Date, the Debtor had no secured indebtedness except for a variety of alleged maritime lien claims against certain vessels. Since the Petition Date, the Debtor has recognized and paid a number of these liens pursuant to the orders of the Bankruptcy Court in an effort to avoid the potential for the continuing accrual of interest.

On April 25, 2007, the Debtor completed the initial public offering of 11,691,667 shares of common stock, comprised of 8,666,667 shares sold by the Debtor and 3,025,000 shares sold by then-existing stockholders. The Debtor received net proceeds from the initial public offering of $118.0 million. On or about April 25, 2007, the Debtor used the proceeds as follows:

- The Debtor paid $68.4 million toward its outstanding senior secured term loan.

- The Debtor paid approximately $6.6 million toward its outstanding balance under its existing revolving credit facility.

- The Debtor made a $28.0 million special cash dividend to its existing stockholders.

- The remaining $17.9 million in proceeds were used for capital expenditures during the three months ended June 30, 2007.

Prior to bankruptcy, the Debtor's common stock was traded on the Nasdaq Global Market under the symbol "DEEP." The following table sets forth by fiscal quarter the high and low sales prices on the Nasdaq Global Market of the Debtor's common stock since the initial public offering:

| Fiscal Quarter Ended | High | Low |
|---|---|---|
| June 30, 2007 | $19.58 | $16.32 |
| September 30, 2007 | 19.04 | 10.10 |
| December 31, 2007 | 12.89 | 4.89 |

As of the Petition Date, there were approximately 190 holders of record of the Debtor's common stock as that term is defined under SEC Rule 12(g)(5-1). The Debtor has been advised that significant trading of the Debtor's common stock has occurred since the Petition Date. The Debtor does not have a current listing of the individual beneficial shareholders.

On April 19, 2008, the Debtor received a letter from Nasdaq stating that, due to the Debtor's failure to file its Form 10-K for the period ended December 31, 2007, the Debtor's shares would be suspended from further trading effective April 28, 2008. Nasdaq subsequently

delisted the Debtor's stock. After the bankruptcy filing, the Debtor filed a Form 15 with the SEC to terminate its registration.

### 3.1.3    Debtor's Financial Information.

According to the Debtor's unaudited financial statements for the year ending December 31, 2007, the Debtor had gross revenues of approximately $261 million and net operating losses of approximately $38 million before taxes. For the period ending March 31, 2008, the Debtor had approximately $20 million in gross revenues and approximately $53 million in net losses before taxes.

Since the Petition Date, the Debtor has conducted operations only to the extent necessary to complete ongoing projects and to transition existing contracts. The Debtor has also liquidated substantially all of its tangible assets pursuant to orders entered by the Bankruptcy Court. The Debtor files monthly operating reports with the Bankruptcy Court which are publicly available for inspection at the office of the Clerk of the Court. As the Debtor has gathered additional information, certain adjustments have been made to the Debtor's prior financial statements and reports. Attached hereto as **Schedule 1** is a copy of the latest monthly operating report filed by the Debtor.

### 3.1.4    Events Leading to Bankruptcy.

According to its SEC filings, the Debtor's prepetition financial problems stemmed from, among other things, dramatic shifts in market conditions and increased operational costs. Specifically, during 2005 and 2006, in order to help satisfy the increased demand for subsea construction and commercial diving services, the Debtor expanded its capacity by acquiring vessels, chartering vessels on both a long- and short-term basis and hiring diving and marine personnel. In addition, the Debtor broadened the scope of the services it provided to include higher-margin subsea and deepwater construction services.

During 2007, however, hurricane-related construction, repair and salvage work in the Gulf of Mexico declined significantly from earlier levels. At the same time, the Debtor incurred significant capital costs, including approximately $125 million in connection with its construction of the vessel *Superior Achiever*, as it continued expansion into deepwater and international locations and sought to obtain new customers and contracts in those regions. Together, these developments, and the Debtor's significantly increased cost of operations, had an adverse effect on the Debtor's financial condition and its liquidity. The Debtor sustained operating losses in 2007 of approximately $23 million.

In an effort to address its deteriorating financial position, the Debtor implemented several initiatives in early 2008, including the sale of the *Superior Achiever* and other tangible assets, the restructuring and liquidation of its ROV (Remote Operated Vehicle) division, the sale of a subsidiary and workforce reductions. The Debtor used a substantial portion of the proceeds from the sale of the *Superior Achiever* to reduce its existing secured indebtedness to Fortis Capital Corporation/Chase Bank. The Debtor also engaged a professional firm to evaluate the company's options regarding a sale or merger or attracting additional capital investment. Despite its efforts, the Debtor's financial difficulties continued. Combined with a dispute with

BPTT regarding a large outstanding receivable, the Debtor ultimately suffered a severe liquidity crisis that necessitated this chapter 11 filing.

### 3.1.5 Debtor's Assets.

On the Petition Date, the Debtor's most valuable tangible assets consisted of (i) one dynamically positioned (or "DP") vessel, the *Superior Endeavor*; (ii) two four-point vessels, the *Gulf Diver III* and the *Gulf Diver VI*; (iii) a 12-man 300 meter saturation diving system (the "SAT-3 System"); and (iv) assorted diving equipment. The Debtor also owned certain claims and causes of action, as well as other intangibles, including the BPTT receivable related to services provided by the Debtor in connection with the installation and connection of a subsea pipeline off the coast of Trinidad.

The Debtor filed with the Bankruptcy Court its Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules"). The Schedules contain a detailed listing of the Debtor's assets and liabilities and the amounts owed its Creditors based on the Debtor's books and records. In connection with this Disclosure Statement, Creditors and Interest Holders are referred to the Debtor's Schedules. A copy of the Debtor's schedules is available from the Clerk's office or from the Debtor upon request.

Pursuant to a court-approved sale procedure, the Debtor sold the *Gulf Diver III*, *Gulf Diver VI*, the *Superior Endeavour* and the Debtor's diving equipment, tools and related personal property to Infinity Investment Funds, LLC for $67,150,000. The Debtor also sold the SAT-3 System to Cal Dive International, Inc. for $12,000,000.

### 3.1.6 Debtor's Real and Personal Property Leases and Executory Contracts

On the Petition Date, the Debtor was a party to the following real property leases in the United States:

| Location | Function | Size (square feet) | Lease Expiration |
|---|---|---|---|
| Houston, Texas | Corporate Headquarters, Sales, Marketing | 16,195 | August 19, 2009 |
| Lafayette, Louisiana | Accounting, Human Resources and Operations | 17,719 | November 30, 2008 |
| Amelia, Louisiana | Fabrication | 82,000 | June 30, 2010 |
| Broussard, Louisiana | Diving Operations | 36,500 | February 28, 2010 |
| Houston, Texas | Warehouse Facility | 22,000 | February 28, 2012 |

During the bankruptcy case, each of the foregoing leases was either rejected or assumed and assigned to a third party. The Debtor is also a party to numerous other personal property leases, several real property leases outside of the United States and executory contracts. Creditors and Interest Holders are referred to the Debtor's Schedule G, attached as **Schedule 2**, for a comprehensive list of the Debtor's various leases and executory contracts. The Debtor

anticipates that all leases and executory contracts that have not been specifically assumed will be rejected either by separate motion or at confirmation.

### 3.1.7 Liabilities and Claims against the Debtor.

The Debtor's Schedules contain a detailed listing of Creditors, together with the estimated amount of Claims. Creditors and Interest Holders are referred to the Debtor's Schedules. The Debtor's Schedules generally organize Creditors into three general groupings: (i) Schedule D-Secured Claims, (ii) Schedule E-Unsecured Priority Claims, and (iii) Schedule F-Unsecured Nonpriority Claims. Moreover, a significant number of proofs of claims have been filed in the Bankruptcy Case. A copy of the current claims docket is attached as **Schedule 3**.

### 3.1.8 Secured Claims.

<u>The Chase LCs</u>

Prior to the Petition Date, JPMorgan Chase Bank, N.A. ("Chase") issued, at the Debtor's request, one or more letters of credit for various beneficiaries including, without limitation: (i) LC #CTCS-289573 in the amount of $8,000,000.00 for the benefit of Hornbeck Offshore Services, LLC (the "Hornbeck LC"); (ii) LC #CTCS-313377 in the amount of $2,725,000.00 for the benefit of JPMorgan Chase Bank, N.A. in support of the Bank Guaranty for Gulmar Offshore Middle East, LLC (the "Chase/Gulmar LC"); (iii) LC #CTCS-347437 in the amount of $742,064.04 for the benefit of The Commercial Bank of Qatar (the "Bank of Qatar LC"); (iv) LC #CTCS-305857 in the amount of $500,000.00 for the benefit of Standard Bank of South Africa (the "Bank of S. Africa LC"); and (v) LC #CTCS-625823 in the amount of $25,000.00 for the benefit of Western Surety Company (the "Western Surety LC," together with the Hornbeck LC, the Chase/Gulmar LC, the Bank of Qatar LC, and the Bank of S. Africa LC, the "Existing LCs"). In addition, prior to the Petition Date, Chase provided secured commercial credit card services and stored value card services for the Debtor.

Pursuant to a Credit Agreement dated as of February 27, 2007, the Debtor granted Chase a security interest in substantially all of its assets, including all deposit and securities accounts. Accordingly, on the Petition Date, Chase had a security interest in the Debtor's account #1831976517 at Chase (the "Collateral Account"), which Chase perfected pursuant to that certain Blocked Account Control Agreement dated as of February 16, 2007, as well as by possession. The balance in the Collateral Account on the Petition Date was approximately $12,756,508.52. Pursuant to the Collateral Account Agreement, Chase has exclusive control over the funds in the Collateral Account and the Debtor is not able to withdraw any funds, or entitled to a return of any funds, until termination of the Collateral Account Agreement, which occurs upon the termination of all of the Existing LCs and the payment of all repayment obligations and fees and expenses relating thereto and the payment of all commercial credit card fees, charges and obligations relating thereto.

In May, 2008, the beneficiaries under the Hornbeck LC and the Chase/Gulmar LC made demand for payment upon Chase. Chase funded the Hornbeck LC on May 12, 2008 by wire transfer in the amount of $8,000,000. Likewise, Chase funded the Chase/Gulmar LC on May 9, 2008 by wire transfer in the amount of $2,725,000. As a result of the foregoing payments, the

First Amended Disclosure Statement in Support of
Joint Chapter 11 Plan of Liquidation, as Modified
Page 10 of 42

Debtor owed Chase the sum of $10,780,636.19 (made up of $10,725,000 principal, $8,500.00 commissions and $47,136.19 in interest through May 31, 2008) plus reasonable attorney's fees. The Court approved setoff procedures concerning the Existing LCs by order entered on July 28, 2008.

The Bank of Qatar LC has expired without demand. It is currently unknown whether the beneficiaries will seek to draw on the SBSA LC or the Western Surety LC.

The Debtor had outstanding undisputed charges under its credit cards as of June 10, 2008, in the amount of $11,479.00. The Debtor cancelled its credit cards shortly after the Petition Date and no further charges are expected.

<u>Miscellaneous Maritime and Other Liens</u>

Multiple vendors and tort claimants have asserted security interests in property of the Debtor's estate pursuant to federal maritime law and other applicable law. The Debtor has sought and obtained Court approval to pay certain maritime liens that were determined to be valid. The Court's claims docket reflects that Secured Claims totaling $9,940,271.55 have been filed. The Debtor has paid (or will pay prior to the Confirmation Date) approximately $1 million of maritime lien claims during the Chapter 11 Case.

### 3.1.9 Priority Claims.

The Debtor's schedules reflect priority unsecured claims in the amount of $535,628.96. Proofs of claim have been filed in Debtor's case asserting priority unsecured claims in the amount of $19,420,498.10. The majority of these claims are attributable to claims asserted by the IRS in connection with several ongoing audits. The Debtor is contesting a majority of the IRS claim and is currently in the administrative appeals process. The Debtor has filed an amended 2007 tax return as part of this process. The IRS originally asserted a priority unsecured claim in the amount of $22,470,890.06 which has been subsequently amended on two separate occasions. The current proof of claim was amended on November 21, 2008 to assert a priority unsecured claim in the amount of $18,403,093.19. Until these audits are completed, the Debtor is unable to estimate the final value of the claims asserted by the IRS. The Debtor and the Committee have concerns that the scope of the audits may be expanded and thereby cause a delay in the final determination of the IRS Claim.

### 3.1.10 Unsecured Claims.

The Debtor's schedules reflect unsecured claims in the amount of $39,751,428.35. This number does not include tort claims, interest or consequential damages for breach of contract claims. Proofs of claim have been filed in Debtor's case asserting general unsecured claims in the amount of $65,763.624.91. In addition, proofs of claim totaling $1,274,270.52 have been filed that are not classified. Finally, a number of proofs of claim have been asserted in "unknown" or "unliquidated" amounts. The Debtor presently expects to file objections to all or part of approximately 45 unsecured proofs of claim, having an aggregate value of approximately $23,000,000 unless those claims are voluntarily reduced by way of settlement or otherwise. The Debtor may decide to file other objections as its analysis continues. The Debtor also intends to

object to a number of unsecured proofs of claim that are filed in "unknown" or "unliquidated" amounts. Finally, should additional or amended proofs of claim be filed, the Debtor will review such claims and may file additional objections. The Plan also provides a mechanism for other parties to object to claims under certain circumstances. The Debtor is unable to predict the outcome of any anticipated claim objections that may be filed.

### 3.1.11 Securities Related Claims.

The Debtor is a defendant in several class action lawsuits involving the sale of securities in connection with the initial public offering. These lawsuits have been consolidated in Civil Action No. 08-cv-00687 before the United States District Court for the Southern District of Texas. The plaintiffs alleged that the Debtor knowingly misrepresented certain facts in connection with the initial public offering. At this time, the Debtor is unable to assess the risk that liability will be imposed at a level above the Debtor's available insurance coverage. Although the damages are unspecified, the Debtor believes that the plaintiffs assert damages in the tens of millions of dollars. The Debtor believes that any such Claims are subordinated in payment under 11 U.S.C. § 510(b). Section 510(b) of the Bankruptcy Code provides that allowed unsecured claims arising out of the purchase or sale of securities are afforded equal priority to the allowed interests of equity owners. The Plan provides that distributions will be made on a pro rata basis to these classes. In order for such distributions to be made, a process must be implemented to convert shares to dollars or dollars to shares. Once converted, the holder of an Allowed Class 7 Claim or Class 8 Interest would receive a Pro Rata share of any Available Cash or Plan Agent Recovery based upon his or her relative percentage to the combined Class 7 and Class 8 total. At present, there is no agreed procedure to accomplish this conversion. Under the plan, the Post-Confirmation Equity Subcommittee has the sole authority to propose a conversion procedure. Any such procedure must be approved by the Bankruptcy Court after notice and opportunity for hearing. Any holder of Allowed Class 7 Claim or Class 8 Interest will have the right to object to any such procedure.

**The last day to file a proof of claim was September 29, 2008**.

THE RIGHT OF ALL PARTIES, INCLUDING THE DEBTOR AND ALL COMMITTEES (WHETHER EXISTING OR FORMED UNDER THE PLAN) TO OBJECT TO ANY CLAIM FILED IN THIS CASE IS EXPRESSLY RESERVED. THE INCLUSION OF A CLAIM OR CLAIMS WITHIN THIS DISCLOSURE STATEMENT IS NOT AN ADMISSION REGARDING THE VALIDITY OR ALLOWANCE OF ANY CLAIM.

## 3.2    Significant Events during the Chapter 11 Case.

### 3.2.1    Retention of Professionals/Approval of CRO.

On May 19, 2008, the Court entered orders (i) granting the Debtor's Application for Authority to Employ Strategic Capital Corporation ("SCC") as the Debtor's Financial Advisor Pursuant to §§ 327 and 330 of the Bankruptcy Code and Motion to Approve the Continuation of H. Malcolm Lovett Jr. as the Debtor's Chief Restructuring Officer; and (ii) granting the Debtor's Application for Authority to Employ Porter & Hedges, L.L.P. as bankruptcy counsel.

### 3.2.2   Appointment of the Committees.

On May 12, 2008, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (previously defined as the "Committee"), consisting of (i) Cross Logistics, Inc./CrossMar, Inc.; (ii) Mako Technologies, L.L.C.; (iii) Amertrin Marine & Logistics Services, Ltd.; (iv) L & L Oil & Gas Services, L.L.C.; and (v) Buxo Trinidad & Tobago, Ltd.  The Committee was subsequently reconstituted on November 3, 2008 to remove Buxo Trinidad & Tobago, Ltd. and Mako Technologies, L.L.C. and to add Infinity Investment Funds, L.L.C.  The Committee has employed Liskow and Lewis as its general bankruptcy counsel and Heller, Draper, Hayden, Patrick & Horn, L.L.C. as special conflicts counsel.

On July 9, 2008, the U.S. Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee"), consisting of (i) Mirador Funds, L.P. for Treeline, L.P. and Fairfield Treeline, Ltd.; (ii) Robert Osmundson; and (iii) Claire Davis.  The Equity Committee has employed Andrews Kurth LLP as its general bankruptcy counsel and Kane Russell Coleman & Logan PC as special conflicts counsel.

### 3.2.3   Asset Sales.

During the course of the case, the Debtor has liquidated substantially all of its tangible assets through a series of sale procedures.  Specifically, the Court entered orders approving bid procedures concerning the SAT-3 System on May 21, 2008 and the Debtor's remaining maritime assets, including the *Superior Endeavor*, the *Gulf Diver III*, the *Gulf Diver VI*, the Debtor's option rights with respect to the *Gulf Diver V*, and various equipment located at the Debtor's Amelia, La. and Broussard, La. equipment yards (the "Maritime Assets"), on June 23, 2008.  In addition, on June 9, 2008, the Court entered an order approving a procedure for the sale of miscellaneous furniture, office equipment, computers, shelving and small tools.

Pursuant to the foregoing procedures, the Debtor sold (i) the SAT-3 System for $12,000,000; (ii) the Maritime Assets for $67,150,000; and (iii) miscellaneous non-maritime assets for approximately $200,000.

### 3.2.4   BPTT Receivable.

In May, 2007, the Debtor entered into a contract with BPTT (the "BPTT Contract") to provide services in connection with the installation and connection of subsea pipeline off the coast of Trinidad.  Specifically, the services provided by the Debtor under the BPTT Contract included project management, coordination of local labor, and specialized marine construction services such as saturation diving, surface air diving and remotely operated vehicle (ROV) services.  The Debtor completed the BPTT project in or around December, 2007.  As of the Petition Date, according to the Debtor's books and records, BPTT owed the Debtor approximately $26,269,750.39 under the BPTT Contract, plus unpaid valued added taxes and retainage.  In a post-petition review, the Debtor determined that a number of billing errors had occurred and that certain adjustments should be made in excess of $2.5 million.  The Debtor has also considered certain risks of its position, including poor/non-existent documentation, superseded invoices, double billing, poor contract drafting, alleged non-performance and the

impact of certain alleged oral agreements. The Debtor's concerns have not been adopted by any other party and all rights to challenge the Debtor's conclusions are specifically preserved. The Equity Committee has requested an opportunity to do its own due diligence regarding the merits of the proposed settlement and has requested discovery from the Debtor regarding same.

On July 14, 2008, BPTT filed its motion for relief from the automatic stay to compel mediation and arbitration pursuant to the terms of the BPTT Contract. On August 11, 2008, the Court entered an Agreed Order requiring the parties to participate in and complete mediation by October 24, 2008. Mediation was postponed but eventually held on November 13th and 14th. At the conclusion of the mediation, the Debtor reached an agreement for the resolution of all issues related to the BPTT Receivable and the BPTT Contract. Under the proposed settlement, the Debtor will receive $11.7 million in cash and a $350,000 reduction of a third-party claim. A motion has been filed to approve the settlement but has not yet been considered by the Bankruptcy Court. The Committee is a proponent of the settlement. Based on its assertion of the lack of available information and the limited information provided to date, the Equity Committee has indicated that it currently opposes the settlement.

### 3.2.5    The Securities Litigation.

As of the Petition Date, the Debtor was a defendant in several federal securities class action lawsuits, which have now been consolidated and are styled *In re: Superior Offshore International, Inc. Securities Litigation*, Civil Action No. 08-cv-00687, pending in the United States District Court, Southern District of Texas (the "Securities Litigation"). No class has yet been certified. A purported class proof of claim has been filed in the bankruptcy case by the lead plaintiff, Mr. Charles Ognar. The Equity Committee filed a motion to strike the class action proof of claim to the extent such claim is asserted on behalf of "all others similarly situated." Mr. Ognar also filed a motion for an order (i) determining that Bankruptcy Rule 7023 applies to his class proof of claim and authorizing him to file a motion for class certification in the bankruptcy court or, in the alternative, (ii) extending the claims bar date for all members of his putative class. The Debtor, the Committee and the Equity Committee filed objections to Mr. Ognar's motion. The parties have agreed to defer these issues and reserve all rights regarding the motion until a later date.

The Debtor has insurance totaling $50 million and is hopeful that any Claims arising out of the Securities Litigation will be satisfied by the Debtor's existing insurance. However, it is not clear whether the damages asserted in connection with the Securities Litigation exceed the relevant insurance policy limits.

There are also two derivative lawsuits against the Debtor's former officers and directors that have been consolidated in the Securities Litigation. Under applicable law, these claims became property of the bankruptcy estate on the Petition Date. These cases are currently stayed and no action has been taken during the Chapter 11 Case. Sections 7.10 and 9.6 of this Disclosure Statement address the preservation of claims and rights.

# ARTICLE 4
## CLASSIFICATION OF CLAIMS

The Claims against the Debtor are classified as set forth in this Article.

**4.1    Claims Against the Debtor.**

The Claims against the Debtor are classified as follows:

**4.1.1    Class 1—Administrative Claims**.    Class 1 is comprised of all Allowed Administrative Claims against the Debtor.

**4.1.2    Class 2—Priority Tax Claims**.    Class 2 is comprised of all Allowed Priority Tax Claims against the Debtor.

**4.1.3    Class 3—Priority Non-Tax Claims**.    Class 3 is comprised of all Allowed Priority Non-Tax Claims against the Debtor.

**4.1.4    Class 4—Secured Claims**.    Class 4 is comprised of all Allowed Secured Claims against the Debtor.

**4.1.5    Class 5—General Unsecured Claims**.    Class 5 is comprised of all Allowed General Unsecured Claims against the Debtor.

**4.1.6    Class 6—Subordinated Claims**.    Class 6 is comprised of all Allowed Subordinated Claims against the Debtor.

**4.1.7    Class 7—Subordinated Securities Claims**.    Class 7 is comprised of all Allowed Subordinated Securities Claims against the Debtor.

**4.1.8    Class 8—Interests**.    Class 8 is comprised of all Allowed Equity Interests in the Debtor.

**4.1.9    Class 9 – Subordinated Interests**.    Class 9 is comprised of all Allowed Subordinated Equity Interests in the Debtor.

# ARTICLE 5
## IMPAIRMENT OF CLAIMS AND RESOLUTION OF CLAIM CONTROVERSIES

**5.1    Impaired Classes.**

Only holders of Claims that are in impaired Classes may vote on this proposed Plan.  The following Classes of Claims and Interests are impaired under the Plan:

**5.1.1**    Class 4 – Secured Claims.
**5.1.2**    Class 5 – General Unsecured Claims.
**5.1.3**    Class 6 – Subordinated Claims.

**5.1.4**   Class 7 – Subordinated Securities Claims.
**5.1.5**   Class 8 – Interests.
**5.1.6**   Class 9 – Subordinated Interests.

**5.2**    **Unimpaired Classes.**

Holders of Claims that are in unimpaired Classes are deemed to have accepted the Plan and are not entitled to vote on this proposed Plan. The following Classes of Claims are not impaired under the Plan:

**5.2.1**   Class 1 – Administrative Claims.
**5.2.2**   Class 2 – Priority Tax Claims.
**5.2.3**   Class 3 – Priority Non-Tax Claims.

**5.3**    **Controversy Concerning Classification, Impairment or Voting Rights.**

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, prior to the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy. Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of the Chapter 11 Case. In addition, the Bankruptcy Court may in accordance with § 506(b) of the Bankruptcy Code conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

## ARTICLE 6
## <u>TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS</u>

**6.1**    **Treatment of Allowed Impaired Claims.**

The Allowed Impaired Claims of the Debtor will be paid as follows:

**6.1.1**   **Class 4—Secured Claims**.

In the sole discretion of the Plan Agent, the holder of an Allowed Class 4 Claim shall receive either (i) the proceeds of the Collateral securing such Claimant's Allowed Secured Claim after satisfaction in full of all superior liens up to the Allowed Amount of the Claimant's Class 4 Claim; or (ii) the Collateral securing such Claimant's Allowed Secured Claim in full and final satisfaction of such claim.

**6.1.2**   **Class 5—General Unsecured Claims**.

Holders of Allowed General Unsecured Claims shall receive a Pro Rata share of Distributions from Available Cash and any Plan Agent Recovery up to the Allowed Amount of such Class 5 Claim as follows:

a. The Plan Agent shall distribute Available Cash to holders of Allowed Class 5 Claims and/or the Disputed Claims Reserve pursuant to Articles 8.4 and 8.5 under the Plan, if applicable, on the Initial Distribution Date. The Plan Agent shall make additional future distributions to holders of Allowed Class 5 Claims from Available Cash and the Plan Agent Recovery as the Plan Agent determines appropriate. In the event that all Allowed Class 5 Claims are paid in full and there exists remaining Available Cash and/or Plan Agent Recovery, holders of Allowed Class 5 Claims shall receive interest from the date that interest began to accrue under applicable non-bankruptcy law to the Payment Date Pro Rata at the Plan Rate. Under no circumstances shall Allowed Class 5 Claims receive payment for post-petition legal fees and expenses.

b. Any Available Cash and/or Plan Agent Recovery remaining after the satisfaction of Allowed Class 5 Claims as set forth above shall be distributed in accordance with Article 5.3 and, if applicable, Articles 5.4 and 5.5 of the Plan.

### 6.1.3   Class 6—Subordinated Claims.

Each holder of an Allowed Class 6 Subordinated Claim shall receive a Pro Rata share of Available Cash and Plan Agent Recovery up to the Allowed Amount of such Claim after payment in full of all Allowed Class 5 Claims as set forth in Article 5.2 of the Plan. In the event that all Allowed Class 6 Subordinated Claims are paid in full and there exists remaining Available Cash or Plan Agent Recovery, holders of Allowed Class 6 Subordinated Claims shall receive interest from the date that interest began to accrue under applicable non-bankruptcy law to the Payment Date Pro Rata at the Plan Rate. Any Available Cash or Plan Agent Recovery remaining after the satisfaction of Allowed Class 6 Subordinated Claims as set forth above shall be distributed in accordance with Articles 5.4 and 5.5 of the Plan.

### 6.1.4   Class 7—Subordinated Securities Claims.

Each holder of an Allowed Class 7 Subordinated Securities Claim shall look first to the proceeds of the Debtor's available insurance policies for satisfaction of its Claim to the extent that such Claim is covered by insurance. Any remaining unpaid Allowed Class 7 Subordinated Securities Claim shall receive a Pro Rata share, in accordance with procedures that shall be established by further order of the Bankruptcy Court upon motion of the Post-Confirmation Equity Subcommittee, with all Allowed Class 8 Interests of all remaining Available Cash and Plan Agent Recovery after payment in full, with interest as provided in the Plan, of all Class 1, 2, 3, 4, 5 and 6 Claims.

### 6.1.5   Class 8—Interests.

All Equity Interests shall be canceled as of the Effective Date. Holders of Allowed Equity Interests shall receive a Pro Rata share with all Allowed Class 7 Claims remaining after application of any available insurance proceeds of all remaining Available Cash and Plan Agent

Recovery after payment in full, with interest as provided in the Plan, of all Class 1, 2, 3, 4, 5 and 6 Claims.  The Post-Confirmation Equity Subcommittee will file a motion with the Bankruptcy Court seeking to establish distribution procedures and rights relative to Class 7 Claims and Class 8 Interests.

### 6.1.6    Class 9—Subordinated Interests.

All Subordinated Interests shall be canceled as of the Effective Date and shall receive no Distributions.

## 6.2    Treatment of Allowed Unimpaired Claims.

The Allowed Unimpaired Claims of the Debtor will be paid as follows:

### 6.2.1    Class 1—Administrative Claims.

Allowed Class 1 Claims shall be paid in cash and in full on the later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such date as the Liquidating Debtor/Plan Agent and the holder of the Allowed Class 1 Claim shall agree.

### 6.2.2    Class 2—Priority Tax Claims.

Allowed Class 2 Claims shall be paid in cash and in full on the later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such date as the Liquidating Debtor/Plan Agent and the holder of the Allowed Class 2 Claim shall agree.

### 6.2.3    Class 3—Priority Non-Tax Claims.

Allowed Class 3 Claims shall be paid in cash and in full on the later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such date as the Liquidating Debtor/Plan Agent and the holder of the Allowed Class 3 Claim shall agree.

## 6.3    Treatment of Executory Contracts and Unexpired Leases.

### 6.3.1    Rejection of Executory Contracts and Unexpired Leases.  All executory contracts and leases that are not assumed under the Plan are rejected, unless otherwise dealt with by the Plan or the Confirmation Order, or any other Order of the Court entered prior to the Effective Date, or which is the subject of a motion to assume pending on the Effective Date.

### 6.3.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases. Damages arising from the rejection of an executory contract or unexpired lease shall be a General Unsecured Claim against the Debtor unless subordinated under applicable law.  Any Claim for damages arising from the rejection of an executory contract or unexpired lease must be asserted in a proof of claim filed with the Bankruptcy Court no later than 45 days following the earlier of: (a) the date of entry of an order of the Bankruptcy Court approving such rejection, or (b) the Effective Date of the Plan.  Any Claims not filed within such times shall be forever barred from assertion against the Debtor or the Liquidating Debtor.  The Liquidating Debtor shall mail a notice to all known affected parties and shall publish a notice in the Houston

Chronicle, the New Orleans Times-Picayune and the Lafayette Daily Advertiser that the Debtor has rejected executory contracts and the deadline for asserting claims.

## ARTICLE 7
## MEANS OF IMPLEMENTATION

**7.1    Vesting of Property of the Estate in the Liquidating Debtor.**

On the Effective Date, all remaining property of the Debtor and of the Estate including all rights to object to Claims, all avoidance actions, causes of action, alter-ego rights, derivative claims, breach of fiduciary duty claims, veil piercing rights, the right to pursue such claims and all other remaining property of the estate as defined in § 541 of the Bankruptcy Code, shall vest in the Liquidating Debtor, free and clear of liens, claims and encumbrances, except as otherwise provided in the Plan.  The Plan Agent shall be the sole officer, director and shareholder of the Liquidating Debtor.  On the Effective Date, the Liquidating Debtor is deemed to have satisfied all liabilities for purposes of dissolution under applicable state law.  The Plan Agent is authorized to execute and file all documents necessary to effectuate the dissolution of the Liquidating Debtor.

**7.2    Continuation of Operations.**

From and after the Effective Date of the Plan, the Liquidating Debtor is authorized to (i) take such action as is necessary to complete an orderly wind-down of its operations, including completing all audits by the IRS; (ii) file claim objections; (iii) make distributions; (iv) prosecute causes of action owned by the Estate, including all claims and causes of action arising under the Bankruptcy Code; (v) pursue, liquidate and administer Estate property; (vi) file tax returns; and (vii) take such other action as provided for under the Plan.

The Debtor will also continue its ongoing efforts to terminate the company's 401(k) retirement plan.

**7.3    General Powers of the Liquidating Debtor.**

In addition to the authorization provided under Article 7.2 of the Plan, the Liquidating Debtor shall have all of the rights, powers and privileges set forth in the Plan, the Confirmation Order or applicable corporate law.  The Liquidating Debtor is authorized and shall have the obligation to take all such actions as in its judgment are necessary and appropriate to effectuate the purposes of the Plan, including but not limited to the following:

**7.3.1**    Make all distributions contemplated under the Plan;

**7.3.2**    Consistent with maintaining the value and liquidating the residual assets of the Liquidating Debtor, invest in time or demand deposits, including certificates of deposit issued by any bank approved as a depository institution by the United States Trustee's office, United States Treasury bonds and other securities guaranteed by the full faith and credit of the United States of America or any agency thereof;

**7.3.3** Supervise and administer the resolution, settlement and payment of Claims and Interests and the distributions to the holders of Allowed Claims and Allowed Interests in accordance with the Plan;

**7.3.4** Enter into any agreement required by or consistent with the Plan and perform all of the Liquidating Debtor's obligations thereunder;

**7.3.5** Abandon any of the assets of the Liquidating Debtor if they conclude that such assets are of no benefit to the Creditors or Interest Holders;

**7.3.6** Participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding and litigate claims on behalf of the Liquidating Debtor, including without limitation all Avoidance Actions and all state and federal causes of action or any other litigation which constitute an asset of the Liquidating Debtor and pursue to settlement or judgment such actions;

**7.3.7** Participate as a party-in-interest in any proceeding before the United States Bankruptcy Court involving the Chapter 11 Case;

**7.3.8** Act in the name of or in the place of the Debtor in any action before the United States Bankruptcy Court or any other judicial or administrative body;

**7.3.9** Take actions and exercise remedies against any entity that owes money to the Liquidating Debtor, including without limitation, the remedies available under any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document; make compromises regarding any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document; and, declare or waive defaults regarding any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document;

**7.3.10** Select and employ such professionals, agents or employees as they deem necessary to assist in the administration of the affairs of the Liquidating Debtor and compensate such persons;

**7.3.11** Hold any unclaimed distribution or payment to the holder of an Allowed Claim in accordance with the Plan;

**7.3.12** Propose any amendment, modification or supplement to the Plan or the Liquidating Debtor's corporate governance documents;

**7.3.13** File dissolution documents with the appropriate governmental agencies to dissolve the Liquidating Debtor once all Distributions have been made pursuant to the Plan;

**7.3.14** Receive, conserve and manage the assets of the Liquidating Debtor and sell or otherwise dispose of such assets for a price and upon such terms and conditions as they

deem most beneficial to the Creditors and Interest Holders and execute such deeds, bills of sale, assignments and other instruments in connection therewith;

**7.3.15** Open and maintain bank accounts on behalf of or in the name of the Liquidating Debtor;

**7.3.16** Pay all taxes, make all tax withholdings and file tax returns and tax information returns and make tax elections by and on behalf of the Liquidating Debtor;

**7.3.17** Pay all lawful expenses, debts, charges and liabilities of the Liquidating Debtor;

**7.3.18** Enforce all provisions of the Plan;

**7.3.19** Protect, perfect and defend the title to any of the assets of the Liquidating Debtor and enforce any bonds, mortgages or other obligations or liens owned by the Liquidating Debtor;

**7.3.20** Carry insurance coverage, including insurance to protect the Plan Agent and the Post-Confirmation Committee against claims brought against the Plan Agent and the Post-Confirmation Committee acting within their capacities with the Liquidating Debtor, in such amounts as they deem advisable;

**7.3.21** Establish such reserves for taxes, assessments and other expenses of administration of the Liquidating Debtor (including without limitation the Disputed Claims Reserve) as may be necessary and appropriate for the proper operation of matters incident to the affairs of the Liquidating Debtor; and

**7.3.22** Exercise such other powers and duties as are necessary or appropriate in their discretion to accomplish the purposes of the Plan.

**7.3.23** In the event that the Post-Confirmation Committee makes a written request to the Plan Agent that the Plan Agent take some action contemplated in this section, and the Plan Agent either fails or refuses to take such action within 15 days of such request, the Post-Confirmation Committee may seek authority from the Bankruptcy Court to take such action on behalf of the Liquidating Debtor. Any party may object to any such request.

## 7.4 Limitations on the Powers of the Liquidating Debtor.

Notwithstanding anything in the Plan to the contrary, and only with a Bankruptcy Court Order entered after notice and opportunity for hearing, may the Liquidating Debtor modify or amend the Plan, except in the manner set forth in the Plan.

## 7.5 The Committees.

The Committee and the Equity Committee shall continue in existence until the Effective Date at which time both committees shall be terminated. On the Effective Date, a Post-Confirmation Committee shall be formed. The Post-Confirmation Committee shall be comprised

of (i) 3 members designated by the Committee at least 3 days prior to the commencement of the Confirmation Hearing, and (ii) 2 members designated by the Equity Committee at least 3 days prior to the commencement of the Confirmation Hearing (the "Post-Confirmation Equity Subcommittee"). In the event of death or resignation of any member of the Post-Confirmation Committee, (i) the remaining members of the Post-Confirmation Committee appointed by the Committee shall have the right to designate a successor, if the member being replaced was designated by the Committee; or (ii) the remaining members of the Post-Confirmation Equity Subcommittee shall have the right to designate a successor if the member being replaced was designated by the Equity Committee. If a Post-Confirmation Committee member assigns its Claim or Interest or releases the Debtors from payment of its Claim or Interest, such act shall constitute a resignation from the Post-Confirmation Committee. Until a vacancy on the Post-Confirmation Committee is filled, the Post-Confirmation Committee shall function in its reduced number. If and when all Class 5 Claims have either (i) been allowed and paid, including interest, if applicable, or (ii) disallowed by Final Order (the "Post-Confirmation Committee Change of Control Date"), the Post-Confirmation Committee shall be reconstituted so that any members designated by the Committee shall be removed from the Post-Confirmation Committee and the Post-Confirmation Equity Subcommittee may designate one additional member in its sole discretion. Upon Final Distribution, the Post-Confirmation Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Post-Confirmation Committee members.

**7.6     The Post-Confirmation Committee.**

The members of the Post-Confirmation Committee shall undertake their duties as specified in the Plan. In serving as a member of the Post-Confirmation Committee, such members shall not assume or be deemed to have assumed any liability to Creditors, Interest Holders, the Debtor, the Liquidating Debtor, the Plan Agent, or any other parties in interest in the Case and shall not be liable for any acts or omissions while acting in that capacity, except for bad faith and acts or omissions constituting malfeasance or gross negligence. The Post-Confirmation Committee shall have the right to retain counsel or other professionals, who shall be paid their reasonable fees and expenses by the Liquidating Debtor. The Bankruptcy Court shall retain jurisdiction to hear any disputes relating to the fees and expenses of the Post-Confirmation Committee's professionals, which disputes, if any, shall be resolved by the Bankruptcy Court after notice and hearing.

**7.7     Resignation/Removal of the Plan Agent.**

The Plan Agent may resign at any time by filing a written notice of resignation with the Bankruptcy Court. Any such resignation shall become effective on the earlier to occur of (i) sixty (60) days after the filing date of such notice; or (ii) the appointment of a successor Plan Agent. The Plan Agent (including any successor Plan Agent) may be removed at any time, with or without cause, by the Bankruptcy Court. Any party-in-interest may apply to the Bankruptcy Court for an order removing the Plan Agent. Following such time as the all members designated by the Committee are removed from the Post-Confirmation Committee, the Post-Confirmation Equity Subcommittee may remove the Plan Agent, which removal shall be immediately effective.

**7.8    Appointment of Successor Plan Agent.**

In the event of the death, resignation or removal (prospective or otherwise) of the Plan Agent, the Post-Confirmation Committee shall designate a successor Plan Agent. Any successor Plan Agent appointed under the Plan shall execute and file a statement accepting such appointment and agreeing to be bound by the terms of the Plan and upon such filing, the successor Plan Agent shall immediately become vested with all the rights, powers, trusts and duties of the Plan Agent.

**7.9    Rights and Duties of Post-Confirmation Committee.**

The Post-Confirmation Committee shall:

**7.9.1**    have the right to review and object to settlements and proposed releases or abandonment of objections to Claims, Claims or Causes of Action by the Liquidating Debtor in accordance with the Plan. The Post-Confirmation Equity Subcommittee shall have the right to separate counsel of its choice; provided that payment (but not accrual) of the fees and expenses of the Post-Confirmation Equity Committee's separate counsel shall be limited to $175,000 until such time as all Class 5 Claims have either (i) been allowed and paid, including interest, if applicable, or (ii) disallowed by Final Order.

**7.9.2**    be vested with authority to petition the Bankruptcy Court for removal of the Plan Agent, or any successor Plan Agent, appointed pursuant to the Plan.

**7.9.3**    perform such additional functions as may be agreed to by the Liquidating Debtor, are provided for in the Confirmation Order, or are provided for by further Order of the Court entered after the Effective Date.

**7.10    Additional Rights and Duties of the Post-Confirmation Equity Subcommittee.**

The Post-Confirmation Equity Subcommittee shall have the right to review, prosecute and settle all claims and Causes of Action against the Debtor's former officers and directors for actions occurring prior to the Petition Date, including but not limited to all derivative claims (including but not limited to Barbara Fontenenlle, derivatively on behalf of Nominal Defendant Superior Offshore International, Inc., Cause No. 2008-16760, filed in the 234th Judicial District of Harris County, Texas and Gary Pearlman, derivatively on behalf of Nominal Defendant Superior Offshore International, Inc., Civil Action No. H-08-0740, filed in the Southern District of Texas, Houston Division). Any recovery shall be delivered to the Plan Agent to be distributed in accordance with the Plan. All claims and Causes of Action may be brought in the name of the Debtor or the Post-Confirmation Equity Subcommittee as the Post-Confirmation Equity Subcommittee determines appropriate in its sole discretion.

**7.11    Compensation Procedures.**

Prior to the Post-Confirmation Committee Change of Control Date, the Plan Agent, the Post-Confirmation Committee, the Post-Confirmation Equity Subcommittee and all professionals

employed by them shall be entitled to payment of their fees and reimbursement of all reasonable expenses on a monthly basis pursuant to the terms of the Fee Procedure Order, provided, however, that no professional shall be required to provide notice of the monthly fee statements to the Office of the United States Trustee, the payment due upon invoices shall be of 100% of fees and expenses, and paragraphs (e) and (f) of the Fee Procedure Order shall not apply. From and after the Post-Confirmation Committee Change of Control Date, the Plan Agent, the Post-Confirmation Committee, the Post-Confirmation Equity Subcommittee shall be entitled to payment of their fees and reimbursement of all reasonable expenses on a monthly basis without further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE 8
## CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED CLAIMS/INTERESTS AND PROCEDURES FOR ASSERTING CLAIMS

**8.1    Objection Process.**

The Liquidating Debtor/Plan Agent shall have the right to object to the allowance of any Claims or Interests provided for under the Plan. Subject to the preceding sentence, all objections shall be litigated to Final Order; provided, however, that the Liquidating Debtor/Plan Agent shall have the authority to compromise, settle or otherwise resolve all objections, for any Claim filed in the amount of $25,000 or less without approval of the Bankruptcy Court or notice to the Post-Confirmation Committee. For all Claims in excess of $25,000, the Liquidating Debtor/Plan Agent shall provide counsel for the Post-Confirmation Committee with 10 days written notice of any proposed settlement. If no objection is served on the Liquidating Debtor within 10 days of the date of such notice, the Post-Confirmation Committee shall be deemed to have consented to such settlement and the Liquidating Debtor/Plan Agent may settle such Claim without approval of any other person or entity. If the Post-Confirmation Committee objects to any proposed settlement or the Post-Confirmation Committee approves such proposed settlement but the Post-Confirmation Equity Subcommittee unanimously objects to the proposed settlement, the Liquidating Debtor shall bring the matter before the Bankruptcy Court for final resolution after notice and hearing. Unless otherwise ordered by the Bankruptcy Court, the Liquidating Debtor/Plan Agent shall file and serve all objections to Claims and Equity Interests no later than (i) 45 days after the later of the Effective Date or the date on which a proof of claim, proof of interest or request for payment is filed with the Bankruptcy Court or (ii) such other date as may be approved by the Bankruptcy Court after notice and hearing.

**8.2    Filing of Claims and Causes of Action.**

The Liquidating Debtor/Plan Agent shall have the exclusive right to file and prosecute any Claims and Causes of Action on behalf of the Debtor/Liquidating Debtor, including all derivative Causes of Action. The Liquidating Debtor/Plan Agent shall have the authority to compromise, settle or otherwise resolve all Claims and Causes of Action filed or asserted in the amount of $25,000 or less without approval of the Bankruptcy Court or notice to the Post-Confirmation Committee. For all Claims and Causes of Action in excess of $25,000, the Liquidating Debtor/Plan Agent shall provide counsel for the Post-Confirmation Committee with 10 days written notice of any proposed settlement. If no objection is served on the Liquidating Debtor within 10 days of the date of such notice, the Post-Confirmation Committee shall be

deemed to have consented to such settlement and the Liquidating Debtor/Plan Agent may settle such Claim or Cause of Action without approval of any other person or entity.  If the Post-Confirmation Committee objects to any proposed settlement or the Post-Confirmation Committee approves such proposed settlement but the Post-Confirmation Equity Subcommittee unanimously objects to the proposed settlement, the Liquidating Debtor shall bring the matter before the Bankruptcy Court for final resolution after notice and hearing.

### 8.3    Disputed Claims Reserve.

A Disputed Claims Reserve shall be established by the Plan Agent for the treatment of Disputed Claims and Disputed Interests.  The Disputed Claims Reserve shall be held in a separate bank account from all other funds held by the Liquidating Debtor/Plan Agent.  The Plan Agent shall deposit into a Disputed Claims Reserve an amount equal to the Pro Rata share of the Distribution allocable to such Disputed Claims and Disputed Interests, in accordance with the distribution scheme contemplated in the Plan, as if such Claims and/or Equity Interests were Allowed Claims or Equity Interests.  Amounts deposited into the Disputed Claims Reserve shall be held in trust for the benefit of the holders of Disputed Claims and Disputed Interests pending a determination of their entitlement thereto under the terms of the Plan.  Once such Disputed Claim is determined by Final Order to be an Allowed Claim, the Plan Agent is authorized to pay the Allowed Amount of such Claim without further approval from or notice to any person or entity.

### 8.4    Distributions to Holders of Disputed Claims and Disputed Interests.

At such time as a Disputed Claim or Disputed Interest becomes an Allowed Claim or Equity Interest, any Distributions reserved for such Allowed Claim or Equity Interest shall be released from the Disputed Claims Reserve on the Payment Date and delivered to the holder of such Allowed Claim or Equity Interest in an amount proportionate to the Allowed Amount of any such Claim or Equity Interest.  In the event that the Disputed Claim or Disputed Interest is disallowed in whole or in part, or otherwise settled in amount less than the Disputed Claim or Disputed Interest amount, the disallowed or reduced portion of such Claim or Equity Interest shall be distributed from the Disputed Claim Reserve to holders of Allowed Claims or Equity Interests as Available Cash in accordance with the Plan without further approval from or notice to any person or entity.

### 8.5    Disallowance of Late Filed Proofs of Claim.

Except as otherwise provided in the Plan, any proof of claim filed by the holder of such Claim after the Bar Date is disallowed unless such proof of claim is subsequently determined to be timely filed or otherwise allowed by Final Order of the Bankruptcy Court issued pursuant to motion of such holder filed no later than thirty 30 days after the Effective Date, after notice and a hearing, finding excusable neglect.

**8.6     Provisions Governing Distributions.**

**8.6.1     Record Date for Claims and Equity Interests.**

The record date for purposes of Distributions to Allowed Claims under the Plan will be the date the Bankruptcy Court enters its order approving the Disclosure Statement. For purposes of Distributions to holders of Allowed Claims, the Liquidating Debtor/Plan Agent will rely on the claims docket maintained by the Clerk for proofs of claim filed in this Chapter 11 Case except to the extent a notice of transfer of Claim or Interest has been filed with the Court prior to the record date pursuant to Bankruptcy Rule 3001. The record date for Distributions to Allowed Interests under the Plan shall be the Equity Interest Record Date. For purposes of Distributions on account of Equity Interests, the Plan Agent will rely on the relevant stock transfer ledger(s) as of the Equity Interest Record Date.

**8.6.2     Delivery of Distributions to Holders of Allowed Claims.**

Subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth on the proofs of claim filed by such holders, or at the last known address of such holder if no proof of claim is filed, unless the holder of the Allowed Claim has otherwise notified the Debtor/Liquidating Debtor in writing of a change of address. If any holder's Distribution is returned as undeliverable, no further Distributions to such holder will be made unless and until the Debtor/Liquidating Debtor is notified in writing of such holder's then current address.

**8.6.3     Delivery of Distributions to Holders of Allowed Equity Interests.**

Distributions to holders of Allowed Equity Interests, to the extent they are entitled to distributions under the Plan, will be made at the address of the registered holder of each such Equity Interest as set forth in the relevant stock transfer ledger(s). If any holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the Debtor/Liquidating Debtor is notified in writing of such holder's then current address.

**8.6.4     Unclaimed Distributions and Uncashed Checks.**

The Plan Agent will file a Notice of Distribution within five Business Days of the date on which Distributions are made under the Plan. All claims for undeliverable Distributions must be made no later than the 90th day following the date that the Notice of Distribution is filed. After such date, all unclaimed Distributions will revert to the Liquidating Debtor for distribution in accordance with the Plan and the Claim or Equity Interest of any holder with respect to such Distribution will be discharged and forever barred. Checks issued in respect of Allowed Claims and/or Equity Interests will be null and void if not negotiated within ninety (90) days after the date of issuance thereof.

**ARTICLE 9**
**EFFECT OF CONFIRMATION**

**9.1     Legally Binding Effect.**

The provisions of the Plan will bind all Creditors and Interest Holders, whether or not they accept the Plan.  On and after the Effective Date, all holders of Claims will be precluded and enjoined from asserting any Claim against the Debtor or its assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date except as specifically permitted under the Plan.

**9.2     Limited Discharge of Debtor and Injunction.**

The Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending legal proceedings, if any, against the Debtor and its assets and properties and any proceedings not yet instituted against the Debtor or its assets and properties, except as otherwise provided in the Plan.  Except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor will be permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor or the Liquidating Debtor, or their property, with respect to any such Claim, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any such Claim against the Debtor or the Liquidating Debtor, or their property, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or the Liquidating Debtor, or their property, with respect to such Claim, (d) asserting any right of subrogation of any kind against any obligation due to the Debtor or the Liquidating Debtor, or the property of the Debtor, the Estate or the Liquidating Debtor with respect to any such Claim. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in this case pursuant to § 105, if any, or § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Effective Date; and (e) asserting any right of setoff or recoupment against the Debtor, the Estate or the Liquidating Debtor.

**9.3     Limited Protection of Certain Parties in Interest.**

Neither (a) the Debtor or any of its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any the Debtor, their officers, directors, employees and representatives, the Plan Agent or any of his employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional person employed by it, nor (b) each Professional for the Debtor or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them, nor (c) the Equity Committee and each of its members, or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them, nor (d) the Unsecured Creditors' Committee and each of its members or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them, nor (e) the Post-

Confirmation Committee and each of its members or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them (the persons identified in (a), (b), (c), (d) and (e) are collectively referred to as "Protected Persons"), shall have or incur any liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection or related to the Debtor, the Chapter 11 Case, or the Estate, including, but not limited to, (i) formulating, preparing disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); or (ii) the disclosure statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan, except for acts constituting willful misconduct or gross negligence and in all respects such Protected Persons shall be entitled to rely in good faith upon the advice of counsel. In any action, suit or proceeding by any Person contesting any action by, or non-action of any Protected Person as constituting willful misconduct or gross negligence or not being in good faith, the reasonable attorneys' fees and costs of the prevailing party will be paid by the losing party and as a condition to going forward with such action, suit, or proceeding at the outset thereof, all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

**9.4    Indemnification.**

The Liquidating Debtor shall indemnify each Person identified as a Protected Person against any and all costs and expenses (including attorneys' fees) incurred by any of them in defending against post-Confirmation Date claims that are based on actions allegedly taken (or not taken) by them in their respective capacities relating to the Debtor, the Liquidating Debtor or the Plan; provided, however, that no Protected Person shall be entitled to indemnification under the Plan for the costs and expenses of defending a cause of action in which it is ultimately judicially determined that such Protected Person was grossly negligent or acted fraudulently or with willful misconduct in performing such Protected Person's duties under the Plan or under any Final Order of the Bankruptcy Court or applicable law. Any Protected Person entitled to indemnification under this section shall have a priority distribution right that is senior to the holders of Allowed Claims in Class 3, Class 4, Class 5, Class 6, Class 7, Class 8 or Class 9. The Plan Agent may use Liquidating Debtor Assets (as an expense of consummating the Plan) to purchase indemnification insurance to satisfy any potential indemnification claims that may arise under this section.

**9.5    Continuation of Anti-Discrimination Provisions of the Bankruptcy Code.**

In accordance with the Bankruptcy Code, the Plan provides that a Governmental Unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Debtor, the Liquidating Debtor, the Plan Agent or another Person with whom the Debtor has been or is associated or affiliated, solely because of the commencement, continuation, or termination of the case or because of any provision of the Plan or the legal effect of the Plan, and the Confirmation Order will constitute an express injunction against any such discriminatory treatment by a Governmental Unit. Moreover, a Governmental Unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the

Debtor or the Liquidating Debtor based upon any requirement that the Debtor or the Liquidating Debtor place a bond or other surety obligation with such governmental unit as a condition of receipt of such a license, permit, charter, franchise, or other similar grant to the Debtor or the Liquidating Debtor.  All licenses, permits, charters, franchises, or other similar grants to the Debtor will be hereby transferred and assigned on the Effective Date to the Liquidating Debtor without the need for further application or approval by any Governmental Unit.

**9.6     Preservation of Claims and Rights.**

Confirmation of the Plan effects no settlement, compromise, waiver or release of any Claim, Cause of Action, Right of Action or claim for relief unless the Plan or the Confirmation Order specifically and unambiguously so provides.  The non-disclosure or non-discussion of any particular Claim, Cause of Action, Right of Action or claim for relief is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim, Cause of Action, Right of Action or claim for relief.

**The Debtor, the Liquidating Debtor and the Plan Agent reserve any and all claims and rights against any and all third parties, whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, the Record Date and/or any Distribution date, including, without limitation, the derivative lawsuits referenced in Sections 3.25 and 7.10 of this Disclosure Statement and any and all Causes of Action, Rights of Action and/or claims for relief that the Debtor, the Liquidating Debtor or the Plan Agent may have against (i) any former director and/or officer of the Debtor and/or any other named defendant in the pending derivative suits involving the Debtor, including but not limited to Louis Schaeffer, James J. Mermis, Patrice Chemin, Roger D. Burks, R. Joshua Koch, Thomas B. Coleman, and Bryan K. Wilson, (ii) any insurer on any directors' and officers' liability and/or similar insurance policies in which either the Debtor and/or its current or former personnel have an insurable or other interest in or right to make a claim against, any other of the Debtor's insurers, and (iii) Hornbeck Offshore Services, LLC, Gulmar Offshore Middle East, LLC, Subtech Marine, Ltd., Subtech Diving, Ltd., Subtech Offshore, Ltd., Goodcrane Corporation, AIG, Tudor Pickering Holt & Co. Securities, Inc., Globaltech Consultants, Inc., Globaltech Offshore, Unique System, L.L.C., Buxo Trinidad and Tobago, Limited and any of their affiliates and insiders.  The entry of the Confirmation Order shall not constitute res judicata or otherwise bar, estop or inhibit any actions by the Debtor, the Liquidating Debtor or the Plan Agent relating to any claims, Causes of Action or Rights of Action referred to in this Article 9.6, or otherwise.  The Plan Agent shall constitute the representative for the Debtor and its Estate for purposes of retaining, asserting and/or enforcing Rights of Action under § 1123(b)(3)(B) of the Bankruptcy Code.  On the Effective Date, the Plan Agent shall be substituted as a party of record in all pending litigation brought by or against the Debtor without need for further order of the Bankruptcy Court.**

## ARTICLE 10
## CONFIRMATION OF THE PLAN

**10.1    Confirmation Hearing.**

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan ("Confirmation Hearing").  The Confirmation Hearing has been scheduled before the Honorable Wesley W. Steen, Chief United States Bankruptcy Judge, on January 28, 2009 at 9:30 a.m. (Houston time), in Courtroom No. 400, 4th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) provides that any party in interest may object to confirmation of the Plan. However, an impaired Creditor or Equity Interest Holder, who votes to accept the Plan, may not have standing to object to the Plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and any applicable Local Rules of the Bankruptcy Court.  Any objection to confirmation must be made in writing and filed with the Bankruptcy Court with proof of service and served upon and actually received on or before January 23, 2009 at 5:00 p.m. (Houston time).

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**10.2    Statutory Requirements for Confirmation of the Plan.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  As set forth in § 1129 of the Bankruptcy Code, these requirements are as follows:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The proponent of the Plan complies with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the Plan proponent, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable.

5.    The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint Plan with the Debtor, or a successor to the Debtor under the Plan; and the appointment to, or continuance in, such office of

such individual, is consistent with the interests of creditors and equity security holders and with public policy; and the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Liquidating Debtor, and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Plan Proponent has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each class of impaired claims or equity interests:

(a)      each holder of a claim or interest of such class:

(i) has accepted the Plan; or

(ii) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Plan Proponent were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b)      if § 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secured such claims.

8.      With respect to each class of claims or interests:

(a)      such class has accepted the Plan; or

(b)      such class is not impaired under the Plan;

9.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that:

(a)      with respect to a claim of a kind specified in § 507(a)(1) or § 507(a)(2) of the Bankruptcy Code, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)      with respect to a class of claims of a kind specified in §§ 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a claim of such class will receive:

        (i)    if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

        (ii)    if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

        (c)    with respect to a claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

10.     If a class is impaired under the Plan, at least one class of claims that is impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the plan proponent or any successor to the plan proponent under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor and the Committee believe that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposal of the Plan is made in good faith.

The Debtor and the Committee further believe that the holders of all Claims and Equity Interests impaired under the Plan will receive payments or distributions under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code.

Finally, as the Plan contemplates a liquidation of all remaining assets, the Debtor and the Committee believe that the confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor.

## 10.3   Cramdown.

In the event that any impaired class of Claims and Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class which has not accepted the Plan, the Plan does not discriminate unfairly and is "fair and equitable."  A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.      With respect to a class of secured claims, the Plan provides:

(a)      (i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Plan Proponent or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)      for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)      for the realization by such holders of the indubitable equivalent of such claims.

2.      With respect to a class of unsecured claims, the Plan provides:

(a)      that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(b)      the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property.

3.      With respect to a class of interests, the Plan provides:

(a)      that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(b)      the holder of any interest that is junior to the interests of such class will not receive or retain under the Plan on account of such junior interest any property.

The Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims and Equity Interests.  The Debtor and the Committee believe that the Bankruptcy Court will find these requirements satisfactory and will confirm the Plan.

## 10.4    Conditions Precedent to Effective Date.

The following are conditions precedent to the occurrence of the Effective Date: (i) the Confirmation Order shall have been entered by the Bankruptcy Court; (ii) the form of all documents necessary or appropriate to give effect to the transactions contemplated under the Plan, if any, have been approved and executed; (iii) all required consents, approvals, and authorizations have been obtained; (iv) there shall be no stay of the Confirmation Order in effect; and (v) all other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

## 10.5    Annulment of Plan if Conditions Not Waived or Satisfied.

The Debtor reserves the right to waive any of the conditions precedent to the Effective Date.  If any of the conditions precedent are not waived, and are not satisfied within the specified time periods or can no longer occur, the Confirmation Order will be annulled and the Debtor and all parties in interest will return to the *status quo ante* immediately before the entry of the Confirmation Order.

## 10.6    Retention of Jurisdiction by Bankruptcy Court.

The Court shall retain and have exclusive jurisdiction over this Chapter 11 Case to the maximum extent provided by law for the follow purposes following the Confirmation Date: (a) to determine any and all objections to the allowance and classification of Claims or Interests; (b) to determine the validity and priority of any Lien; (c) to determine the Allowed Amount of any Claim, whether secured or unsecured; (d) to allow any and all applications for allowances of compensation and reimbursement of expenses payable from the estate; (e) to determine any and all applications or motions pending before the Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any executory contract or unexpired lease; (f) to consider and approve any modification of the Plan, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Court, including the Confirmation Order; (g) to hear and determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or related to any of the foregoing; (h) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor; (i) to issue orders in aid of execution and implementation of the Plan and the Confirmation Order, to the extent authorized by 11 U.S.C. §1142 or provided by the terms of the Plan; and (j) to hear and determine matters concerning federal, state or local taxes in accordance with §§ 346, 505 or 1146 of the Bankruptcy Code.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

## 11.1    Compliance with Law.

The Plan mandates compliance by the Liquidating Debtor/the Plan Agent and any other person charged with carrying out any provisions of the Plan with all withholding and reporting

requirements imposed by federal, state and local taxing authorities, and all distributions under the Plan will be subject to such withholding and reporting requirements.  In addition, the Plan requires that the Liquidating Debtor/the Plan Agent, if notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, comply with such law, rule, regulation or order, unless the legality or applicability of such requirement is being contested in good faith in an appropriate proceeding and, if appropriate, an adequate reserve has been set aside.  Finally, all fees payable to the United States Trustee pursuant to § 1930 of Title 28 of the United States Code will be paid on or before the Effective Date.

**11.2    Amendments to the Plan.**

The Plan may be amended or modified by the Debtor before, or by the Liquidating Debtor/Plan Agent after the Effective Date, as provided in § 1127 of the Bankruptcy Code.

**11.3    Timing of Distributions.**

Unless otherwise specified in the Plan, all payments and Distributions shall be made on the Payment Date.  When a provision of the Plan requires that a payment shall be made on a certain date, such payment may be made (i) at any time prior to the date on which such payment is due; (ii) in more frequent intervals than set forth in such provision of the Plan; or (iii) not more than 10 days after the date any such payment is due.  Notwithstanding the foregoing, no payment shall be considered late or otherwise result in a default unless the Liquidating Debtor has failed to make the payment after the passage of 30 days following the receipt by the Liquidating Debtor of a written notice advising that a payment has not been received in accordance with the times set forth in this paragraph.  At the ten month anniversary of the Effective Date, to the extent: (1) sufficient Available Cash exists and (2) all claims senior to Class 5 Claims have been paid in full, then the Plan Agent shall make a full and final Distribution from Available Cash to Holders of Allowed Class 5 Claims and reserve funds sufficient to pay all disputed Class 5 Claims. Subject to the foregoing conditions, the Plan Agent may begin making Distributions to Holders of Class 6 and 7 Claims and Class 8 and 9 Interests in accordance with the terms of the Plan. The Post-Confirmation Equity Subcommittee shall have the right to seek an order from the Bankruptcy Court compelling the foregoing Distribution if such Distribution is not timely made.

**11.4    Other Considerations.**

The Plan affords holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the Chapter 11 Case; (b) alternative plans of reorganization/liquidation; (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code; and (d) dismissal of the Chapter 11 Case.

**11.5    Feasibility of the Plan.**

Pursuant to the Plan, the Debtor proposes to liquidate and distribute all assets of the estate to holders of Allowed Claims and Equity Interests pursuant to the terms of the Plan.  Inasmuch as the Plan is based on the liquidation of Debtor's assets, the Plan is feasible.

**11.6 Continuation of the Case.**

The Debtor is no longer operating and has liquidated substantially all of its tangible assets. There is no strategic or economic advantage to continuing this case for any significant period of time. The Debtor believes that in view of the current situation, Creditors and Interest Holders will best be served by the rapid resolution of this bankruptcy case.

**11.7 Alternative Plans of Reorganization.**

If the Plan is not confirmed, another party in interest in the case could attempt to formulate and propose a different plan or plans. Such plans might, theoretically, involve some other form of liquidation of the Debtor's assets. Any alternative plan, however, would likely result in additional administrative expenses to the estate and would provide little or no benefit. The Plan is straightforward, meets the requirements of § 1129 and provides the best outcome for Creditors and Interest Holders.

**11.8 Liquidation under Chapter 7.**

The Debtor and the Committee do not believe that the case should be converted to Chapter 7. Conversion to Chapter 7 would result in additional administrative expenses attributable to statutory trustee fees, as well as professional fees for any trustee's professionals. Moreover, a chapter 7 liquidation provides no additional benefit to Creditors and Interest Holders. The Plan facilitates the prompt liquidation of the Debtor's assets with the input of the Debtor's constituents and the distribution of cash in accordance with the Bankruptcy Code.

If the case were converted to a chapter 7 case, the Debtor and the Committee believe that liquidation would take substantially the same form as contemplated under the Plan, except that payments would be significantly delayed and that an additional layer of administrative expenses from the chapter 7 trustee and its professionals would be incurred.

As set forth above and assuming the BPTT settlement is approved and consummated, the Debtor and the Committee estimate that the estate will have approximately $95 million on the Effective Date.

Under the Plan, Administrative and Priority Claims will be paid in full. Assuming the above estimate for Administrative Claims and assuming that Priority and Secured Claims are paid as filed and post-confirmation costs are less than $1 million, the Debtor estimates that approximately $60 million would be available for payment of Unsecured Claims. The ultimate distribution to Unsecured Claims will depend upon the ultimate allowance/disallowance of claims. Should excess funds exist after payment of General Unsecured Claims, holders of such Claims would be entitled to interest at the rate of 8%.

**11.9 Risk Factors.**

Both failure to achieve confirmation of the Plan, and consummation of the Plan, are subject to a limited number of risks. In addition, there are certain risks inherent in the liquidation

process under the Bankruptcy Code. If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if Creditors and Equity Interest holders accept the Plan. Although the Debtor and the Committee believe that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtor to resolicit acceptances, which could delay and/or jeopardize confirmation of the Plan. The Debtor and the Committee believe that the solicitation of votes on the Plan will comply with § 1126(b) and that the Bankruptcy Court will confirm the Plan. Nether the Debtor nor the Committee can, however, provide assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a resolicitation of acceptances.

As the Plan is a liquidating plan, the Debtor and the Committee believe that minimal execution risk exists.

## 11.10 Taxation.

### 11.10.1 Introduction.

The following discussion summarizes certain federal income tax consequences of the transactions described herein and in the Plan. This discussion is for informational purposes only and does not constitute tax advice. This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice as of the date of this Disclosure Statement and will not be updated for subsequent tax developments. Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed. Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, insurance companies, dealers and traders in securities and currencies, partnerships and other entities classified as partnerships for federal tax purposes and tax-exempt organizations. Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties including subsequent legislative and other tax changes. No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("IRS") on these or any other tax issues. There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### 11.10.2 Tax Consequences to the Debtor.

The Debtor will realize cancellation of indebtedness ("COI") income in respect of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor is (or are deemed to be) discharged; and (ii) the sum of any cash or the "issue price," under the Internal

Revenue Code of 1986 (the "Internal Revenue Code") §§ 1273(b) and 1274, of any debt obligations distributed under the Plan in discharge of such Claims.  The exact amount of COI income realized upon consummation of the Plan has not been finally determined. Under the Internal Revenue Code, a taxpayer is generally required to include COI income in gross income. COI income is not includable in gross income; however, if it occurs in a case under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a Court in such case and the cancellation of indebtedness is granted by the Court or is pursuant to a plan approved by the Court.   The Debtor's COI income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtor.  COI income that is excluded from gross income will reduce certain tax attributes of the taxpayer, including net operating loss (hereinafter "NOLs") carryovers, capital loss carryovers and the tax basis of assets, in a specified order of priority beginning with the NOLs and NOL carryovers, unless the taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. The reduction of tax basis is limited to the excess of (i) the aggregate of the tax bases of the taxpayer's property (determined immediately after the discharge); and (ii) the aggregate liabilities of the taxpayer (determined immediately after the discharge).

### 11.10.3        Tax Consequences to Creditors.

**In General**.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the Claimant receives consideration in more than one tax year, (c) whether the Claimant is a resident of the United States, (d) whether all the consideration by the Claimant is deemed to be received by that Claimant as part of an integrated transaction, (e) whether the Claimant utilizes the accrual or cash method of accounting for tax purposes, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

**Gain or Loss on Exchange**.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

The tax treatment of an Allowed Claim for accrued unpaid interest will depend on the Claimant's tax basis in such Claim, which primarily depends on whether the Claimant has previously recognized income for the accrual of such interest and/or recognized a loss with respect to same.  Any such holders should consult with its tax advisor regarding the tax treatment of any such accrued unpaid interest.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 11.10.4 Preservation of Net Operating Loss and Tax Attributes.

Section 382 of the Internal Revenue Code could substantially limit, or deny in full, the availability of the Debtor's net operating loss and tax credit carryforwards as a result of the transactions contemplated under the Plan, which could impact the amount of any tax claim. Moreover, Section 108 of the Internal Revenue Code could result in the reduction of the loss and credit carryforwards based on the amount of debt discharged or converted to equity in the Liquidating Debtor as provided by the Plan.

### 11.10.5 Information Reporting and Backup Withholding.

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 11.10.6 Importance of Obtaining Professional Assistance.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. TO COMPLY WITH TREASURY DEPARTMENT CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT, THE PLAN OR ANY RELATED MATERIALS, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; AND (B) ANY SUCH DISCUSSIONS ARE BEING USED ONLY IN CONNECTION WITH SATISFYING THE REQUIREMENTS IMPOSED UNDER THE BANKRUPTCY CODE FOR DISCLOSURE STATEMENTS, AND (C) YOU SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR WITH RESPECT TO YOUR FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES BASED ON YOUR PARTICULAR CIRCUMSTANCES.**

## ARTICLE 12
## CAUSES OF ACTION

### 12.1    Preferences.

Under the Bankruptcy Code, the Debtor may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtor been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to such recoveries.  Transfers made in the ordinary course of the Debtor's and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable. Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property. If a transfer is recovered by the Debtor, the transferee has an Unsecured Claim against the Debtor to the extent of the recovery.

### 12.2    Fraudulent Transfers.

Under the Bankruptcy Code and various state laws, the Debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the Debtor insolvent.  The Debtor, Liquidating Debtor, and Plan Agent reserve the right to bring fraudulent conveyance claims.

The Debtor has conducted a limited analysis of potential recoveries under Chapter 5 of the Bankruptcy Code and concluded that potential claims may exist.  These include but are not limited to claims against AIG, Hornbeck, Louis Schaeffer and others.  A partial list of payments and their recipients that made be avoidable is attached as **Schedule 4**.  Creditors and Equity Interest holders are advised that if they received a voidable transfer, they may be sued whether or not they vote to accept the Plan.  All avoidance actions and rights pursuant to §§ 542, 543, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and all causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by the Liquidating Debtor/Plan Agent in their sole discretion.  To the extent that material amounts are recovered, it will enhance the returns to the holders of Unsecured Claims.

## ARTICLE 13
## VOTING PROCEDURES AND REQUIREMENTS

### 13.1    Ballots and Voting Deadline.

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement.  A Creditor who is voting must (1) carefully review the ballot and instructions thereon, (2) complete and execute the ballot indicating the Creditor's vote to either accept or reject the Plan, and (3) return the executed ballot to the address indicated thereon by the deadline specified by the Bankruptcy Court.

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtor by 12:00 noon, Houston time, on January 26, 2009.

If you hold an impaired Claim against the Debtor return your ballot to:

> PORTER & HEDGES, L.L.P.
> 1000 MAIN STREET, 36TH FLOOR
> HOUSTON, TEXAS 77002
> ATTN.: DAVID R. JONES

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED
BY 12:00 NOON HOUSTON TIME ON JANUARY 26, 2009**

**13.2    Creditors and Interest Holders Entitled to Vote.**

Any Creditor whose Claim is impaired under the Plan is entitled to vote, if either (i) the Debtor has scheduled its Claim on its Statement of Liabilities and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Creditor has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for filing Proofs of Claim and no objection has been filed to such Claim.

Holders of Disputed Claims are not entitled to vote on the Plan. Any Claim to which an objection has been filed and remains pending, is not entitled to vote unless the Bankruptcy Court, upon motion by the Creditor who holds a Disputed Claim, temporarily allows the Claim in an amount that it deems proper for accepting or rejecting the Plan. Any such motion must be heard and determined by the Bankruptcy Court before the date established by the Bankruptcy Court as the final date to vote on the Plan. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Creditor was not solicited or obtained in good faith or according to the provisions of the Bankruptcy Code.

Classes of Claims that are not impaired are deemed to have accepted a plan of reorganization pursuant to § 1126(f) and, therefore, are not entitled to vote on a plan. Pursuant to § 1126, only classes of claims or interests that are "impaired" are entitled to vote on a plan of reorganization. Generally, a claim is impaired if the plan of reorganization alters the legal, equitable, or contractual rights to which the holder of such claim is otherwise entitled.

Holders of Equity Interests on the Equity Interest Record Date are entitled to vote on the Plan.

**13.3    Voting Procedures.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, and the Debtor's determination will be final and binding. The Debtor also reserves the right to reject any Ballot not in proper form, the

acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor further reserves the right to waive any defects or irregularities or conditions or delivery as to any particular Ballot. The interpretation by the Debtor of the provisions of this Disclosure Statement and the Ballots will be final and binding on its parties in interest unless otherwise directed by the Bankruptcy Court. Unless waived, any defects or irregularities concerning deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determine. Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liability for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made and will be invalidated unless or until all defects and irregularities have been timely cured or waived.

**13.4    Vote Required for Class Acceptance.**

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half in number of the allowed Claims of the class actually voting to accept or reject the proposed plan.

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Interests as the acceptance by holders of at least two-thirds (2/3) in amount of the allowed Interests in the class actually voting to accept or reject the proposed plan.

**13.5    Cramdown and Withdrawal of the Plan.**

If the Plan is not accepted by all classes of impaired Creditors, the Debtor and the Committee reserve the right to withdraw the Plan. If the Plan is accepted by one or more Classes of impaired Creditors of the Debtor, the Debtor and the Committee reserve the right to request the Bankruptcy Court to approve the Plan under 11 U.S.C. § 1129(b).

**THE DEBTOR AND THE COMMITTEE STRONGLY URGE ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN**.

**Dated:  January 9, 2009.**

**__/s H. Malcolm Lovett, Jr._____**
H. Malcolm Lovett, Jr.,
Chief Restructuring Officer for
Superior Offshore International, Inc.

**_/s Terry Braud_____**
Terry Braud
Chairman of the Committee